1

2

3

4

5

6                    **IN THE UNITED STATES DISTRICT COURT**

7                      **FOR THE DISTRICT OF ARIZONA**

8
    **Scott Bizar, dba Fantasy Games )**
9   **Unlimited,                    )**
                                     **)   CIV 11-02036 PHX MEA**
10   **Plaintiff/Counter-Defendant, )   CIV 11-02247 PHX MEA**
                                     **)**
11          **vs.                    )   ORDER**
                                     **)**
12  **Jeffrey Dee, Jack Herman,      )**
    **Monkey House Games, Inc.,      )**
13                                   **)**
                                     **)**
14   **Defendants/Counter-Plaintiffs )**
                                     **)**
15  **_____ )**

16

17
          All of the parties have acquiesced to the exercise of
18
    magistrate judge jurisdiction, including the entry of final
19
    judgment.[1]   Before the Court are Plaintiff/Counter-Defendant
20
    Bizar's  motion  for  summary  judgment  (Doc.  47)  and
21
    Defendants/Counter-Plaintiffs' motion for summary judgment (Doc.
22
    50).
23
               **I Procedural Background**
24
          Plaintiff filed an amended complaint on October 19,
25
    2011, alleging a cause of action for defamation, commercial
26
    disparagement, unfair competition, misappropriation, breach of
27

28   _____
          [1] On March 8, 2012, the Court dismissed Defendant Monkey House
    Games, Inc., based on Plaintiff's failure to serve this defendant
    within the time allowed by the Federal Rules of Civil Procedure.

contract, and two counts pursuant to the Lanham Act for trademark infringement.

On July 27, 2011, Defendants/Counter-Plaintiffs initiated a suit against the Plaintiff in the United States District Court for the Middle District of Florida, alleging a cause of action for copyright infringement.  On November 11, 2011, that matter was transferred to the United States District Court for the District of Arizona and assigned docket number CV 11-2247 PHX DKD. In that matter Defendants/Counter-Plaintiffs were represented by counsel located in Florida.

Defendants/Counter-Plaintiffs Herman and Dee were served with Plaintiff's complaint on or about December 19 and December 20, 2011.  The Clerk of the Court entered the default of Defendants/Counter-Plaintiffs Herman and Dee on January 13, 2012.

On January 23, 2012, ten days after the Clerk of the Court entered default against them, Defendants/Counter-Plaintiffs Herman and Dee, appearing pro se and intending to represent and act on behalf of Defendant Monkey House Games, Inc., filed a motion seeking to set aside the entry of default against each of the three defendants, citing Rule 55 and Rule 60(b), Federal Rules of Civil Procedure.  In an order entered March 16, 2012, the Court denied the motion to set aside Defendants' default.  In an order entered April 2, 2012, the Court consolidated docket number 11-2036 with docket number 11-2247.

On July 11, 2012, the Court granted Plaintiff's motion for judgment by default with regard only to Count I and Count II

of Plaintiff's complaint, the counts alleging defamation and commercial disparagement.  On September 25, 2012, the Court granted Plaintiff's motion for a hearing on the damages to be awarded on the judgment entered in favor of Plaintiff.  In an order issued November 28, 2012, the Court entered judgment in favor of Plaintiff and against Defendants as to Count I and Count II only, in the amount of $52,300.  See Doc. 68.

Before the Court are Plaintiff's motion (Doc. 47) for summary judgment with regard to the remaining counts of the complaint, and Defendants' motion for summary judgment with regard to the claims stated in the counter-complaint (Doc. 50).

**II   Standard   for   determining   motions   for   summary judgment**

Rule 56 of the Federal Rules of Civil Procedure provides that judgment shall be entered if the pleadings, depositions, affidavits, answers to interrogatories, and admissions on file show that there is no genuine dispute regarding the material facts of the case and the moving party is entitled to a judgment as a matter of law.  See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247, 106 S. Ct. 2505, 2509-10 (1986); Giles v. General Motors Acceptance Corp., 494 F.3d 865, 872 (9th Cir. 2007).

> For purposes of deciding a motion for summary judgment, "genuine" means that the evidence about the fact is such that a reasonable jury could resolve the point in favor of the non-moving party, and "material" means that the fact is one that might affect the outcome of the suit under the governing law.

United States v. One Parcel of Real Prop. with Bldgs., 960 F.2d 200, 204 (1st Cir. 1992).  See also Guidroz-Brault v. Missouri

Pac. R.R. Co., 254 F.3d 825, 829 (9th Cir. 2001).

The party seeking summary judgment bears the initial burden of informing the Court of the basis for its motion, and identifying those portions of the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, which it believes demonstrate the absence of any genuine issue of material fact. See Celotex Corp. v. Catrett, 477 U.S. 317, 323, 106 S. Ct. 2548, 2553 (1986).

When a party moving for summary judgment has carried its burden under Rule 56, "its opponent must do more than simply show that there is some metaphysical doubt as to the material facts." Matsushita Elec. Indus. Co. v. Zenith Radio, 475 U.S. 574, 586, 587, 106 S. Ct. 1348, 1356 (1986). The party opposing the motion may not rest upon the mere allegations or denials of his pleadings, but instead must produce some significant, probative evidence tending to contradict the moving party's allegations, thereby creating a genuine question of fact for resolution at trial. Anderson, 477 U.S. at 248, 256-57; 106 S. Ct. at 2510, 2513-14 (holding the plaintiff must present affirmative evidence in order to defeat a properly supported motion for summary judgment).

A principal purpose of summary judgment is "to isolate and dispose of factually unsupported claims." Celotex, 477 U.S. at 323-24, 106 S. Ct. at 2553. Summary judgment is appropriate against a party who "fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at

trial." Id., 477 U.S. at 322, 106 S. Ct. at 2552; see also Citadel Holding Corp. v. Roven, 26 F.3d 960, 964 (9th Cir. 1994). Because plaintiffs bear the burden of proof at trial, a defendant has no burden to negate a plaintiff's claims to prevail on a motion for summary judgment. See Celotex, 477 U.S. at 323, 106 S. Ct. at 2552- 53.

Furthermore, the evidence presented in opposition to a motion for summary judgment must be probative and properly supported. See Zoslaw v. MCA Distrib. Corp., 693 F.2d 870, 883 (9th Cir. 1982). To successfully rebut a properly supported summary judgment motion, the non-moving party "must point to some facts in the record that demonstrate a genuine issue of material fact and, with all reasonable inferences" made in the nonmoving party's favor, could convince a reasonable jury to find for that party. Reese v. Jefferson Sch. Dist. No. 14J, 208 F.3d 736, 738 (9th Cir. 2000). See also Bias v. Moynihan, 508 F.3d 1212, 1218 (9th Cir. 2007) (stating the non-moving party must present evidence that is significant and probative). It is not the Court's task to scour the record in search of a genuine issue of triable fact. See Carmen v. San Francisco Unified Sch. Dist., 237 F.3d 1026, 1028-29 (9th Cir. 2001) (holding that, even if evidence in the record is later found to create a genuine issue of material fact, the Court may grant summary judgment if the opposing party's papers do not include or conveniently refer to that evidence); Keenan v. Allen, 91 F.3d 1275, 1279 (9th Cir. 1996) (finding a district court is not required to scour the record in search of a genuine issue of triable fact). The non-moving party must "identify with

reasonable particularity the evidence that precludes summary judgment." <u>Keenan</u>, 91 F.3d at 1279. <u>See</u> <u>also Simmons v. Navajo County, Ariz.</u>, 609 F.3d 1011, 1017 (9th Cir. 2010).

On summary judgment, the Court may not make credibility determinations or weigh conflicting evidence. <u>See</u> <u>Musick v. Burke</u>, 913 F.2d 1390, 1394 (9th Cir. 1990). The Court must consider a party's motion for summary judgment construing the alleged facts with all reasonable inferences favoring the non-moving party. <u>See</u>, <u>e.g.</u>, <u>Genzler v. Longanbach</u>, 410 F.3d 630, 636 (9th Cir. 2005). However, the mere existence of a scintilla of evidence supporting the nonmovant's petition is insufficient; there must be enough evidence from which a trier of fact could reasonably find for the non-movant. <u>Anderson</u>, 477 U.S. at 251-52 ("[T]he inquiry ... is ... whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law.").

**III Factual summary**

In 1979 Plaintiff and his father owned and operated a New York corporation, "Fantasy Games Unlimited, Inc." ("FGU"). <u>See</u> Doc. 48 (Plaintiff's Statement of Facts in support of Plaintiff's motion for summary judgment) ("PSOF"), Exh. A. The corporation was formed for the purpose of creating, publishing, marketing, and selling "role-playing" games. <u>Id.</u>, Exh. A. When contracting with authors and artists, FGU's standard practice was that authors and artists of games retained the copyrights on published works and FGU was granted an exclusive right to publish and market the product. <u>Id.</u>, Exh. A.

On or about February 23, 1979, FGU contracted with Defendants Herman and Dee, who were then minors, to write the materials and to draw the characters for a book presenting the setting and rules for a "role-playing" game.  Id. (Doc. 48), Exh. A & Exh B.  The contract addressed the parties' respective rights in a 1979 printing of an illustrated book, "Villains and Vigilantes, Super Hero Role Play" ("1979 Work").  Id., Exh. B.

In the agreement, Defendants Herman and Dee retained the copyright to the content of the 1979 Work, i.e., the characters, setting, stories, and images comprising the book "Villains and Vigilantes."  Id., Exh. B.  The contract specifically provides that the copyright in the cover art and illustrations for Villains and Vigilantes will be registered in the name of Defendant Herman.  Id., Exh. B.  In the agreement FGU is granted an exclusive right to publish the 1979 Work and agrees to pay royalties to Defendants Herman and Dee as a percentage of the sales of the 1979 Work on a bi-annual basis.[2] Id., Exh. B.

Specifically, the contract provides FGU will have the "sole and exclusive right" to publish "in book form" a sixty-page "literary work" to be titled "Villains and Vigilantes." Id., Exh. B.[3]  The contract provides that the publisher, FGU, may not change the text or the pictures illustrating the work without the authors' consent.  Id., Exh. B.  Notably, the

---

[2] The contract contains a "governing law" provision, stating that the agreement will be governed by the laws of the State of New York. Doc. 48, Exh. B.

[3] The copyright of the published work indicates the book was 38 pages in length.  Doc. 48, Exh. D.

contract specifies that any rights not specifically granted to the publisher remain with the authors.  <u>Id.</u>, Exh. B.  The contract states that the agreement between the parties terminates if the publisher fails to keep the book "in print and for sale," "or if its [FGU's] business is liquidated".  <u>Id.</u>, Exh. B.  The contract also states that no assignment of the rights granted in the contract is binding without the consent of the other parties to the contract.  <u>Id.</u>, Exh. B.

Plaintiff registered the copyright for the book "Villains and Vigilantes" in the name of Defendants Herman and Dee with the Library of Congress on May 8, 1979.  <u>Id.</u>, Exh. D.  In 1979, 1980, 1981, and 1982, FGU published, marketed, and sold "book" copies of the 1979 Work, and FGU paid Defendants Herman and Dee royalties in accordance with the 1979 Agreement.  <u>Id.</u>, Exh. A & Exh. E & Exh. G.  After the 1979 Work was published, Defendant Dee was employed by FGU for a short time as a freelance artist.  <u>Id.</u>, Exh. A.  In 1981 Defendant Dee returned to work at FGU in a full-time position as an artist and was paid a weekly salary.  <u>Id.</u>, Exh. A.

After becoming employed at FGU in 1981, Defendant Dee proposed that a revised edition of Villains and Vigilantes be produced.  Doc. 47 (Plaintiff's response to Defendants' motion for summary judgment) at 5.  A revised version of the 1979 Work (the "1982 Work") was created and offered for sale when all remaining copies of the 1979 Work were sold in 1982.  Doc. 48 (PSOF), Exh. F.  Defendant Dee produced new art and a new cover for the book form of the 1982 Work in his capacity as a full-time salaried employee of FGU.  <u>Id.</u>, Exh. A.  The 1982 Work

incorporates into the game several "characters" copyrighted by other individuals, and the 1982 Work exhibits the notation: "Scott Bizar editor". Id., Exh. F.

Plaintiff asserts that, because the content of the 1982 game did not differ greatly from the 1979 Work, the parties deemed the 1982 Work to be a continuation of the 1979 Work and a new written agreement regarding the 1982 Work was not created. Id., Exh. A.  Defendants/Counter-Plaintiffs do not contest that a new written agreement regarding the 1982 Work was not created. Following the production of the 1982 Work, FGU continued to pay royalties to Defendants/Counter-Plaintiffs Herman and Dee on the sales of the 1982 Work under the same terms as for the 1979 Work.  Id., Exh. A & Exh. G.

Plaintiff became the sole owner of FGU, Inc., the New York corporation, in 1987.  Id., Exh. A.  In 1987, Plaintiff moved to Arizona and began doing business in and from Arizona as "Fantasy Games Unlimited."  Id., Exh. A.  Plaintiff asserts that, as a matter of law, Fantasy Games Unlimited, Inc., the New York corporation, transferred to Plaintiff all of its assets and legal rights, including any rights arising from and obligations due Defendants under the 1979 Agreement.  Id., Exh. A.  Because he was no longer using the New York corporate entity, that corporation was administratively dissolved by the State of New York.  From at least 2007 forward, all payments of royalties by FGU to Defendants Herman and Dee were paid from Plaintiff's business account with the title "Waterloo Adventure Games." Id., Exh. G.

Plaintiff contends that, from 1982 through 2010, Defendants Dee and Herman received and accepted royalties for the sales of the 1982 Work without objection or any request to Plaintiff to cease or desist from publication.[4]   Doc. 47 (Plaintiff's response to Defendants' motion for summary judgment) at 5.   The 2010 and 2011 royalties tendered to Defendants Dee and Herman by Plaintiff were refused by Defendants Dee and Herman.   <u>See</u> Doc. 62 (attachments to Plaintiff's controverting statement of facts regarding Defendants' motion for summary judgment), Exh. A; Exh. G; Exh. H.

Attached to Plaintiff's Statement of Facts in support of his motion for summary judgment are royalty statements showing sales of copies of Villains and Vigilantes in "book" and "box" form, showing payments to Defendants/Counter-Plaintiffs Herman and Dee in 1985 and 1986.   Doc. 48, Exh. G.   There is a single royalty statement for sales from 1987 through 1990, indicating 2127 box sets sold and 1678 copies of the rules book sold.   There is no royalty statement for the years 1990 through 1994.   There is a single royalty statement covering the years 1994 through 1997.   The royalty statement for 1997 and 1998 indicates only a fraction of the copies sold in 1987 through 1990 were sold in 1997 and 1998.   There is no royalty statement

---

[4] A royalty statement for the second half of 1995 reflects diminished sales of Villains and Vigilantes and there is a note from Plaintiff on the statement that avers the low sales were because the book was "out of print due to request of Jeff's attorney while the arbitration was going on" and that the book was "now back in print...."   Doc. 62, Exh. F at part 11 (Doc. 62-5) (attachments to Plaintiff's controverting statement of facts in response to Defendants' motion for summary judgment).

in the record supplied by Plaintiff indicating sales of the "book" form of the game or the rules book for the game in 1999, 2000, 2001, 2002, or 2003, or any royalties paid to either Defendant during that time period.  The statements indicate 15 copies sold in 2004, 16 and 3 copies sold in 2005, 32 copies in 2006, and 62 copies in 2007.  In comparison, in 1983, 3792 copies of the book were sold in the first half of the year.

Beginning in 1984, FGU began imprinting the notation "TM" next to the title "Villains and Vigilantes" on each published copy of the game. Id., Exh. A; Exh. I; Exh. J; Exh. K.  Other than stylization of the letter "I" in each of the words, the lettering of the title "Villains and Vigilantes" is not particularly distinctive; the lettering of the words is drawn in all capital sans-serif and the "logo" does not incorporate any artwork.

In June of 2005, Defendant/Counter-Plaintiff Dee allowed in an interview with a trade publication that he believed FGU owned the Villains and Vigilantes trademark and that he believed he had no alternative but to use a new name for future products. In response to a query as to why Defendant Dee's company, Monkey House Games, was marketing the game using a new name, Defendant/Counter-Plaintiff stated: "That is basically it. Can't call the new game V&V with FGU owning the Trademark, and can't pry the trademark away from FGU, so there's no real alternative. But, gosh darn it, I 'like' the new name." PSOF, Exh. A & Exh. N at 40.

Sometime in 2010, Plaintiff learned that Defendants/Counter-Plaintiffs, via their business Monkey House

Games, were using or planned to use the "Villains and Vigilantes" title on a new series of books. On July 29, 2010, Plaintiff's counsel sent a demand letter to Defendants' counsel, demanding that Defendants cease and desist from such usage.

In 2010 Defendant/Counter-Plaintiff Dee filed an application with the United States Patent and Trademark Office for the Villains and Vigilantes "logo," and Plaintiff Bizar filed a trademark application for an almost identical logo several months later. A dispute regarding the ownership of the trademark is currently stayed in the United States Patent and Trademark Office pending the outcome of this litigation.

**IV Analysis of the parties' claims for judgment as a matter of law**

Defendants allege:

> FGU published V&V pursuant to the contract, though the publication of V&V lasted only a few years. After V&V Revised was developed and written in approximately 1982, FGU began publishing V&V Revised, though FGU's contractual ability to publish V&V Revised is unknown. No contract was ever created regarding V&V Revised. FGU also published works related to V&V Revised, including game-related products, works of art, t-shirts, sourcebooks, etc. Neither party prints or is interested in printing the original edition of V&V. Today, V&V now only has a collectors' value, but V&V Revised continues to sell.
> ***
> Section 17 of the contract required FGU to keep V&V "in print and for sale...," something Bizar and FGU failed to do beginning decades ago.
> FGU failed to continue printing V&V in approximately 1987. Section 17 of the contract states: "This agreement shall cease and terminate... [i]f the Publisher fails to keep [V&V] in print and for sale… or if [FGU] ceases to do business for any reason[,] all rights herein granted shall revert to [Herman

and Dee]....” Dee and Herman wish to publish—and have been publishing—V&V Revised or a derivative version called “V&V 2.1.” Bizar continues to violate Dee and Herman’s copyright and publication rights by distributing only electronic .PDF copies of V&V Revised.

Defendants/Counter-Plaintiffs allege:

[that] printing of V&V Revised ceased in approximately 1987, long after printing of V&V had already ceased, Bizar and FGU stopped using the logo.  Bizar started using the V&V logo again when he started printing an electronic version (a “.pdf”) of V&V Revised in approximately 2010.

12. ...The V&V logo did not change in terms of general shape and color between the V&V and the V&V Revised versions of the game.

***

14. Dee and Herman registered the copyright for V&V Revised on January 27, 2011.

The Court concludes, as explained infra, that the exclusive license granted to FGU in the 1979 agreement and ratified, in essence, by Defendants’ continued performance with regard to the 1982 agreement, does not extend to intellectual property other than the printed “book” form of the 1979 and the 1982 versions of Villains and Vigilantes.  Because Defendants Dee and Herman hold the copyright to the characters and setting, Defendants presumably may create and market derivative works and obtain the financial benefits therefrom.  Additionally, because the marketing rights to the characters do not appear to have been transferred, Defendants hold the right to produce and sell or license such items as clothing, video games, card games, and movies or television programs.

-13-

1        **A. Defendants/Counter-Plaintiffs' motion for judgment**
2   **as a matter of law**

3        Defendants/Counter-Plaintiffs' Counter-Complaint states
4   a cause of action for copyright infringement and seeks
5   declaratory judgment, asking the Court to declare the rights,
6   title, and interests of the parties in the copyrighted material
7   at issue between the parties.

8        **Copyright infringement**

9        Defendants/Counter-Plaintiffs have alleged a cause of
10  action against Plaintiff for infringement of their copyrights in
11  the book Villains and Vigilantes, including the 1982 Work.

12        "To establish a prima facie case of copyright
13  infringement, a plaintiff must show (1) ownership of a valid
14  copyright and (2) violation by the alleged infringer of at least
15  one of the exclusive rights granted to copyright owners by the
16  Copyright Act." UMG Recordings, Inc. v. Augusto, 628 F.3d 1175,
17  1178 (9th Cir. 2011).  Among the exclusive rights granted to
18  copyright owners by the Copyright Act are the right to
19  reproduction, the right to display, and the right to
20  distribution.  See 17 U.S.C. § 106(1), (3), & (5).  "While the
21  Copyright Act does not require that the infringer know he is
22  infringing or that his conduct amount[s] to a willful violation
23  of the copyright owner's rights, it nonetheless requires conduct
24  ...."  CoStar Group, Inc. v. LoopNet, Inc., 373 F.3d 544, 549
25  (4th Cir. 2004).

26        The parties do not dispute that the copyright to
27  Villains and Vigilantes belongs to Defendants Herman and Dee.
28  The 1979 contract between the parties gave Plaintiff an

exclusive license to publish, market, and sell the 1979 version of a sixty-page book form of the game. Additionally, although a new agreement was not signed with regard to the 1982 Work, Defendants/Counter-Plaintiffs acquiesced, by their actions, in an extension of that contract allowing Plaintiff to publish, market, and sell a revised version of the game. However, the contract does not provide for the assignment of any other copyright possessed by Defendants Herman and Dee, and the agreement specifically reserves to Defendants any rights not specifically granted therein to Plaintiff.

Accordingly, infringing conduct would include Plaintiff's publication of the 1979 version, 1982 version or any other work in an electronic form, i.e., any form other than "book" form. See Maljack Productions, Inc. v. GoodTimes Home Video Corp., 81 F.3d 881, 885 (9th Cir. 1996); Cohen v. Paramount Pictures Corp., 845 F.2d 851, 854 (9th Cir. 1988) (holding the owner of a license to exhibit a film "by means of television" was not entitled to exploit the picture in a new medium (videocassettes) which was anticipated by neither party at the assignment of the license). Plaintiff's offering for sale of copies of the 1982 Work in a "PDF" format would infringe Defendant's copyright in the 1982 Work because the agreement did not contemplate publication of the 1982 Work in any other form than "book" form.

Additionally, the contract does not provide for merchandising rights, but does allow that any right not specifically transferred remains with the authors. Accordingly, Plaintiff's manufacture and sale of merchandise, such as

calendars, mugs, or apparel, representing the copyrighted artwork, stories, and characters created by Defendants constitutes infringement of Defendants' copyrights.

Therefore, Defendants/Counter-Plaintiffs' are entitled to judgment as a matter of law with regard to the claim stated in the Counter-Complaint for copyright infringement.

**B. Plaintiff's motion for judgment as a matter of law**

Plaintiff seeks judgment as a matter of law on his claims for violation of trademark rights and unfair competition pursuant to section 1114 and section 1125 of the Lanham Act, unfair competition pursuant to Arizona law, common-law misappropriation of commercial marks, and breach of contract.

**Trademark claims**

The threshold issue with regard to Plaintiff's claims against Defendants/Counter-Plaintiffs is which party or parties own the "trademark" to the title "Villains and Vigilantes" to identify in commerce this game and products bearing this trademark. The reason this is a trademark issue and not a copyright issue is because the title of a literary work may not be copyrighted.[5]  Initially, the Court notes that the 1979 contract provided that the authors held the copyright to the cover art and all illustrations; accordingly, to the extent that

---

[5] Titles are not subject to copyright protection, and a copyright does not carry the exclusive right to use the title on any other work. See 2 McCarthy on Trademarks and Unfair Competition § 10:34 (4th ed.). See also, e.g., Arnstein v. Porter, 154 F.2d 464, 474 (2d Cir. 1946). Owning the copyright on a work, therefore, "does not carry with it the exclusive right to use of the title on any other work," resulting in the conclusion that "the only legal protection for literary titles lies in the field of trademarks and unfair competition, where likelihood of confusion is the test."  McCarthy on Trademarks § 10:34.

the "logo", i.e., the lettering of the words "Villains and Vigilantes" was part of the cover art, it is arguable Defendant Dee holds the copyright to the logo used on the 1979 work.  The contract does not specifically mention the right to trademark the title of the work.[6]

The issue, put simply, is who owns the right to use the title or mark "Villains and Vigilantes" to identify the game as their product.  The parties do not dispute that "Villains and Vigilantes" was not registered as a trademarked name, as a trademark, as trade dress, or as a "logo", prior to 2010.  Under section 43(a) of the Lanham Act, 15 U.S.C. § 1125(a), a claimant may still prove the validity of an unregistered mark.  See, e.g., Fleischer Studios, Inc. v. A.V.E.L.A., Inc., 654 F.3d 958, 966-67 (9th Cir. 2011).  Where no trademark has been registered, the plaintiff asserting infringement bears the burden of proof as to the validity and protectability of the unregistered marks.  See Yellow Cab of Sacramento v. Yellow Cab of Elk Grove, Inc., 419 F.3d 925, 927 (9th Cir. 2005).

> The right to trademark and service mark rights is based on prior use, or the one who first uses the marks in connection with a peculiar line of business. Trademark rights do not generally arise from registration. [R]egistration does not create the underlying right in a trademark.  That right which accrues from the use of a particular name or

---

[6] Because common-law trademark rights are "'appropriated only through actual prior use in commerce,'" Planetary Motion, Inc. v. Techsplosion, Inc., 261 F.3d 1188, 1193-94 (11th Cir. 2001), quoting Tally-Ho, Inc. v. Coast Cmty. Coll. Dist., 889 F.2d 1018, 1022 (11th Cir. 1989), neither party could possess a trademark "right" prior to the date that the 1979 Work entered the marketplace.  See also Tillamook County Creamery Ass'n v. Tillamook Cheese & Dairy Ass'n., 345 F.2d 158, 160 & n.2 (9th Cir. 1965).

> symbol, is essentially a common law property right. An essential element of a claim of trademark infringement is a likelihood of confusion among prospective purchasers of plaintiff's products and services caused by defendants' use of plaintiff's marks.

Volkswagenwerk Aktiengesellschaft v. Wheeler, 814 F.2d 812, 815-16 (1st Cir. 1987). See also Miller v. Glenn Miller Productions, Inc., 454 F.3d 975, 979 (9th Cir. 2006). Common law "[t]rademark rights develop when goods bearing the mark are placed in the market and followed by continuous commercial utilization." Buti v. Perosa, S.R.L., 139 F.3d 98, 103 (2d Cir. 998) (citation omitted).

> It is a broad federal unfair competition provision which protects unregistered marks similar to the way that Section 32(1), 15 U.S.C. § 1114(1), protects registered marks. The section prohibits two forms of unfair competition: (i) the infringement of unregistered marks, names, and/or trade dress; and (ii) false advertising, that is, misleading or deceptive representations as to the quality or characteristics of the defendant's goods or services. See 4 McCarthy on Trademarks and Unfair Competition § 27:9 at 27:18-19 (2001).

Twentieth Century Fox Film Corp. v. Marvel Enterprises, Inc., 155 F. Supp. 2d 1, 20 (S.D.N.Y. 2001).

When trademark and unfair competition claims pursuant to 15 U.S.C. § 1114(1)(a)[7] and 1125(a)[8] are brought in the same

---

[7]

Any person who shall, without the consent of the registrant--
(a) use in commerce any reproduction, counterfeit, copy, or colorable imitation of a registered mark in connection with the sale, offering for sale, distribution, or advertising of any goods or services on or in connection with which such use is likely to cause confusion, or to cause mistake, or to deceive; or
(b) reproduce, counterfeit, copy, or colorably imitate a registered mark and apply such reproduction, counterfeit, copy,

suit and based on the same infringing conduct, courts apply the same analysis to both claims. <u>See</u> <u>Toho Co., Ltd. v. William Morrow & Co., Inc.</u>, 33 F. Supp. 2d 1206, 1210 (C.D. Cal. 1998), <u>citing</u> <u>E.& J. Gallo Winery v. Gallo Cattle Co.</u>, 967 F.2d 1280, 1288 n.2 (9th Cir. 1992).[9]  To succeed on a claim for trademark infringement or unfair competition, the moving party must establish:

> (1) ownership of the trademark at issue;
> (2) use by defendant, without authorization, of a copy, reproduction, counterfeit or colorable imitation of the moving party's mark in connection with the sale, distribution or advertising of goods or services; and
> (3) that defendant's use of the mark is likely to cause confusion, or to cause mistake or to deceive.

<u>Toho Co., Ltd.</u>, 33 F. Supp. 2d at 1210.

---

or colorable imitation to labels, signs, prints, packages, wrappers, receptacles or advertisements intended to be used in commerce upon or in connection with the sale, offering for sale, distribution, or advertising of goods or services on or in connection with which such use is likely to cause confusion, or to cause mistake, or to deceive,
shall be liable in a civil action by the registrant for the remedies hereinafter provided. Under subsection (b) hereof, the registrant shall not be entitled to recover profits or damages unless the acts have been committed with knowledge that such imitation is intended to be used to cause confusion, or to cause mistake, or to deceive.

[8] Section 43(a) prohibits the use of
any word, term, name, symbol, or device, or any combination thereof, or any false designation of origin ... likely to cause confusion, or to cause mistake, or to deceive as to the affiliation, connection, or association ... with another person, or as to the origin, sponsorship, or approval of his or her goods, services, or commercial activities by another person ....

[9] "As these statutes indicate, a claim of unfair competition, unlike a claim of trademark infringement, does not require that a defendant use the plaintiff's trademark." <u>Bird v. Parsons</u>, 289 F.3d 865, 877-78 (6th Cir. 2002).

The parties to this matter do not dispute any of these elements except ownership of the "mark", i.e., the title "Villains and Vigilantes" and the logo identifying printed works as such.   The parties do not dispute that Plaintiff used the notation "TM" for the title and logo for Villains and Vigilantes on works produced by FGU, specifically the 1982 Work, and identified Villains and Vigilantes as being a product of FGU beginning at least in 1984 and continuing to be offered for sale in the marketplace by FGU uninterrupted at least through 1990. Plaintiff then again used the title and logo on works offered in commerce by FGU from 1994 through 1998 and from 2003 through 2010.

Defendants/Counter-Plaintiffs argue that, if Plaintiff possessed a valid right to the trademark of Villains and Vigilantes, he abandoned the trademark and, accordingly, Defendants are not liable for infringement.

The Lanham Act provides that a mark is "abandoned" "when any course of conduct of the owner ... causes the mark ... to lose its significance as a mark."

> A mark shall be deemed to be "abandoned" if either of the following occurs:
> (1) When its use has been discontinued with intent not to resume such use. Intent not to resume may be inferred from circumstances. Nonuse for 3 consecutive years shall be prima facie evidence of abandonment. "Use" of a mark means the bona fide use of such mark made in the ordinary course of trade, and not made merely to reserve a right in a mark.
> (2) When any course of conduct of the owner, including acts of omission as well as commission, causes the mark to become the generic name for the goods or services on or in connection with which it is used or otherwise to lose its significance as a mark. Purchaser motivation shall not be a test for

determining abandonment under this paragraph.
15 U.S.C. § 1127.

"Once held abandoned, a mark falls into the public domain and is free for all to use.  While acquiescence may bar suit against one person, abandonment opens rights to the whole world.  Abandonment paves the way for future possession and property in any other person." 3 McCarthy on Trademarks and Unfair Competition § 17:1 (4th ed.).  "Abandonment is an issue of fact, subject to the normal procedural rules governing factual issues...."  Id.  See also Zelinski v. Columbia 300, Inc., 335 F.3d 633, 639 (7th Cir. 2003).

Plaintiff did not continue to produce published, bound, book forms of Villains and Vigilantes after producing the 1982 printing of the 1982 Work, presumably because copies of the 1982 Work remained available for sale and another printing was not necessary.  Accordingly, until the time the bound copies of the 1982 Work "sold out", if ever, the 1982 Work has remained "in print."

However, the record indicates that there were no sales of the 1982 Work and, presumably, the use of the "Villains and Vigilantes" logo in commerce, from the years 1990 through 1994 and the years 1999 through 2004, i.e., a period of four years and a period of five years.  Plaintiff did not, apparently, continue to actively promote the 1982 Work, noting in a 1998 royalty statement that the sales of the work were primarily due to Defendants' efforts.  See Doc. 62, Exh. F at part 12 (Doc. 63-1).  Defendants apparently began to object to Plaintiff's continued use of the title at some point in 2005 and the

-21-

ownership of the trademark was apparently at issue at that time. Plaintiff also apparently ceased to sell the work as a product of FGU in 2007, but instead began to do business as Waterloo Adventure Games. The Court therefore concludes that any right to the trademark "Villains and Vigilantes" was abandoned by Plaintiff at least when he ceased to use the mark from 1999 through 2004.

Accordingly, having found that Plaintiff abandoned the trademark to Villains and Vigilantes, Defendants' use of the title Villains and Vigilantes does not infringe a trademark owned at that time by Plaintiff. Defendants are entitled to judgment as a matter of law with regard to Plaintiff's claim for unfair competition and trademark infringement.

**Count V of Plaintiff's Amended Complaint**

Count V of Plaintiff's amended complaint alleges a cause of action for unfair competition pursuant to Arizona Revised Statutes § 14-1441 et seq. The contract provides that it will be governed by New York law, and there is no basis for the application of Arizona law. Other than Plaintiff's residency in Arizona, there is no reason for Arizona law to apply. Accordingly, Defendants are entitled to judgment as a matter of law with regard to Plaintiff's claim for unfair competition pursuant to Arizona law.

**Count VI of Plaintiff's Amended Complaint**

With regard to his claim for misappropriation based on state law, Plaintiff alleges he has "invested significant time, money, skill or effort to create a product of commercial value represented by the Marks," i.e., the "Villains and Vigilantes"

logo.     Plaintiff   further   asserts   that   "Defendants   have
appropriated the value of the Marks" and that "Plaintiff has
been injured as a result of Defendants' misappropriate of his
Marks."

As   noted   supra,   the   contract   between   the   parties
provided that New York law would apply to the contract.

> The New York law of unfair competition is
> broad and encompasses claims involving the
> misappropriation of a plaintiff's creative
> efforts   as   well   as   claims   for   false
> designation of origin. <u>See e.g.</u>, <u>Roy Export
> Co. Establishment of Vaduz v. Columbia Broad.
> Sys.</u>, 672 F.2d 1095, 1105 (2d Cir. 1982)
> (discussing misappropriation branch and its
> evolution); <u>Kregos v. Assoc. Press</u>, 3 F.3d
> 656, 666 (2d Cir. 1993) (discussing both
> branches   in   the   context   of   a   copyright
> claim). "State law claims that rely on the
> misappropriation branch of unfair competition
> are preempted" by the federal copyright laws.
> <u>Warner Bros. Inc. v. Am. Broad. Cos., Inc.</u>,
> 720 F.2d 231, 246 (2d Cir. 1983) (citation
> omitted); <u>see also</u> <u>Arden v. Columbia Pictures
> Indus., Inc.</u>, 908 F. Supp. 1248, 1263
> (S.D.N.Y. 1995) (finding that a state law
> unfair competition claim that "[d]efendants
> misappropriated [plaintiff's work] for their
> own   commercial   gain   and   profit"   sounds   in
> misappropriation and is thereby preempted).

<u>Twentieth Century Fox Film Corp.</u>, 155 F. Supp. 2d at 24-25.

Because Plaintiff raised a federal law claim regarding
Defendants/Counter-Plaintiffs' alleged misappropriation of his
trademarks, the Court concludes this claim is preempted and the
claim resolved by the Court's resolution of the Lanham Act
claims.

**Count VII of the Amended Complaint**

Plaintiff alleges a cause of action for breach of
contract.   Because the contract contains a New York choice of
law provision, the Court applies New York's principles of

contract interpretation in deciding this issue. The task in a contract case is to give effect to terms of the contract as the parties understood them.  See <u>Cromwell Towers Redevelopment Co. v. City of Yonkers</u>, 41 N.Y.2d 1, 390 N.Y.S.2d 822, 359 N.E.2d 333, 337 (1976); <u>Hartford Accident & Indem. Co. v. Wesolowski</u>, 33 N.Y.2d 169, 350 N.Y.S.2d 895, 305 N.E.2d 907, 909 (1973).

It is unlikely that, in 1979, any of the parties contemplated who would own the rights to a video game or "PDF" form of Villains and Vigilantes.  Accordingly, the Court must look for the meaning that reasonable persons in the positions of the parties would have attached had they thought about the matter.

> [F]aced with what may be ... a failure to anticipate the future situation which arose, a court is faced not so much with the function of interpreting language as the parties intended, for their intention was incomplete, but of construing the language to accord with what would have been the intention and the honorable agreement of the parties if their attention had been drawn to the possible events as they actually were to occur....

<u>Welles v. Turner Entertainment Co.</u>, 503 F.3d 728, 734-35 (9th Cir. 2007).

Therefore, the Court concludes that Defendants have not breached the 1979 contract between the parties and, accordingly, Defendants are entitled to judgment as a matter of law with regard to this count of the amended complaint.

**V Conclusion**

The Court concludes that, as a matter of law, Plaintiff abandoned any right to the use of the trademark Villains and

Vigilantes and, accordingly, Defendants are entitled to judgment as a matter of law with regard to Plaintiff's Lanham Act claims because Plaintiff has not established an element of these claims, i.e., the current ownership of the trademark.  The Court further concludes that Plaintiff's other claims fail as a matter of law.

The Court further concludes that, other than possessing a license to produce and market the printed book forms of the 1979 and 1982 Works, Plaintiff has no right to the copyrighted works of Defendants.  Specifically, Plaintiff was not licensed to produce or market a PDF form of the 1982 Work or to produce or market such items as comic books, apparel, or other merchandise utilizing copyrighted elements of the Villains and Vigilantes role-playing game created by Defendants.

Therefore,

**IT IS ORDERED that** Plaintiff's motion for judgment as a matter of law (Doc. 47 in 2:11 cv 2036) is **denied** with regard to the remaining counts of the amended complaint.  Judgment shall be entered in favor of Defendants and against Plaintiff with regard to the remaining claims stated in the amended complaint.

**IT IS FURTHER ORDERED that** Defendants' motion for judgment as a matter of law (Doc. 50 in 2:11 cv 2036) is **granted** with regard to the claims for relief stated in the counter-complaint.  **Judgment in favor of Defendants and against Plaintiff is entered with regard to the claims stated in the Counter-Complaint (Doc. 5 in 2:11 cv 2247).**

1        The Clerk of the Court shall enter separate judgment

2   accordingly.

3        DATED this 15th day of January, 2013.

4

5   _____

6                    Mark E. Aspey
                 United States Magistrate Judge